Filed 8/31/16  P. v. Meighan CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B261364 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA427483) |
| v. | |
| MARCUS JERMAINE MEIGHAN et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County.  Henry J. Hall, Judge.  Affirmed.

Rachel Lederman, under appointment by the Court of Appeal, for Defendant and Appellant Marcus Jermaine Meighan.

David McNeil Morse, under appointment by the Court of Appeal, for Defendant and Appellant Terrel Hysaw.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Noah P. Hill, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants Marcus Jermaine Meighan and Terrel Hysaw[1] appeal from judgments entered after they were convicted in a joint trial of several gang-related felonies.  Both defendants contend that no substantial evidence supported a finding that their gang was a criminal street gang, and Hysaw contends that the trial court improperly imposed consecutive sentences which subjected him to multiple punishment in violation of Penal Code section 654.[2]  We find no merit to defendants' contentions, and thus affirm the judgments.

## BACKGROUND

Defendants were jointly charged in count 1 with the attempted murder of Eric Richardson, Sr. (Richardson, Sr.), and in count 2 with the attempted murder of Eric Richardson, Jr. (Richardson, Jr.), in violation of sections 664 and 187, subdivision (a).  Defendants were also jointly charged in count 4 with discharging a firearm from a motor vehicle, in violation of section 26100, subdivision (c).  In addition, Hysaw was charged in count 3 with evading an officer in violation of Vehicle Code section 2800.2, subdivision (a).  The information specially alleged that defendants committed counts 1 and 2 willfully, deliberately, and with premeditation within the meaning of section 664, subdivision (a).  In counts 1 and 2, it was alleged pursuant to section 12022.53, subdivisions (b) and (c), that a principal personally and intentionally used and discharged a firearm during the commission of the offenses, and in count 4, that Meighan personally and intentionally discharged a firearm, causing great bodily injury to Richardson, Sr. within the meaning of section 12022.53, subdivisions (d), and (e)(1).  As to all counts it was also alleged, pursuant to section 186.22, subdivision (b), that the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by gang

---

[1]     We shall refer to appellants collectively as defendants, and to each appellant individually by his surname.

[2]     All further statutory references are to the Penal Code, unless otherwise indicated.

2

members.  Finally, the information alleged that Meighan had suffered a prior conviction for which he had served a prison term as described in section 667.5, subdivision (b).

A jury found Meighan guilty of counts 1, 2, and 4 as charged, and found true all special allegations.  With regard to each of counts 1, 2, and 4, the jury found Hysaw guilty of the lesser included offense of accessory to a felony as defined in section 32, and found him guilty of count 3 as charged.  The gang allegation was found to be true as to all such counts.

On January 7, 2015, the trial court sentenced Meighan to life in prison with a 15-year minimum parole eligibility as to count 1, plus a consecutive firearm enhancement of 25 years to life pursuant section 12022.53, subdivision (d).  An identical term was imposed as to count 2, to run consecutively.  The court imposed the middle term of five years as to count 4, with a gang enhancement of 10 years and firearm enhancement of 25 years to life, all stayed pursuant to section 654.  The court imposed mandatory fines and fees, and awarded Meighan a total of 778 days of presentence custody credit.

On February 4, 2015, the trial court sentenced Hysaw to a total term of eight years eight months in prison, comprised of the upper term of three years as to count 3, plus a four-year gang enhancement, and a consecutive one-third middle term of eight months as to count 1, with a gang enhancement of one year.  The court imposed terms of seven years in prison as to each of counts 2 and 4, and stayed them pursuant to section 654.  The court awarded Hysaw a total of 1,412 days of presentence custody credit.

Each defendant filed a timely notice of appeal.

**Prosecution evidence**

### *The shooting and police pursuit*

The prosecution presented evidence that defendants were both members of the Rolling 60's Neighborhood Crip gang (Rolling 60's).  On March 2, 2013, at about 8:20 a.m., Hysaw and Meighan entered the territory of the rival Hoover Crip gang, and stopped near Richardson, Sr. and Richardson, Jr., who were walking northbound on Figueroa Street.  Hysaw was driving a loaner car he had obtained from a used car dealer, and Meighan was in the passenger seat.  Meighan said to the two men, "What's up,

3

Groove?"  Richardson, Sr. recognized the word "Groove" to mean a Hoover gang member, and Meighan's question as "gang talk."  Meighan pointed a firearm at the two men and fired two or three times, hitting Richardson, Sr. in the leg.  Hysaw then drove northbound at a normal rate of speed as Richardson, Jr. called 911.  Within about three minutes of the shooting, Los Angeles Police Department (LAPD) Officers Abel Estopin and Mauricio Aranda received radio calls about the shooting and drove, with sirens on, in their separate patrol cars toward the location.

Within minutes, Hysaw passed within sight of uniformed LAPD Officer Ronald Roberson, who was waiting on his police motorcycle at a nearby traffic light.  Officer Roberson estimated Hysaw's speed at 65 to 70 miles per hour in a 35 mile per hour zone, so he activated his lights and siren and proceeded to follow Hysaw's car in an attempt to effect a traffic stop, as Officer Estopin, having heard Officer Roberson's broadcast regarding his pursuit, joined him.  As Hysaw continued to travel at 65 to 70 miles per hour, Officer Roberson could see the two occupants of the car look back at him through the rear view and side mirrors.  Hysaw made a series of turns, drove through stop signs in a school zone, and then slowed to 15 or 20 miles per hour to allow Meighan to get out of the car, run, and hide in a nearby garage.  Hysaw continued to drive at a high rate of speed while being pursued by Officer Roberson and other officers who had joined the pursuit, all with lights and sirens activated.  Soon, Hysaw collided with a fence, got out of the car, and ran away from the officers until he was stopped and taken into custody.

### Gang expert's testimony[3]

LAPD Officer Gilberto Gaxiola testified as the prosecution's gang expert.  He detailed his education and experience with regard to Los Angeles criminal street gangs, including his five-year assignment to the 77th Division gang enforcement detail.  During those five years, Officer Gaxiola was assigned to the Rolling 60's gang, one of the largest gangs in Los Angeles.  It was his task to gather intelligence on a daily basis, and his

---

**3**　　　As the sole issue relating to gang evidence is whether substantial evidence supported a finding that the Rolling 60's Crip gang was a criminal street gang, we summarize only the testimony relevant to that issue.

4

duties included getting to know the neighborhood, its residents, gang members and their families, and assisting detectives in their investigations. By Officer Gaxiola's estimate, he had spoken to 500 or 600 members of the Rolling 60's during his career. Although about 200 of the gang members were under arrest when he spoke to them, most of the others had spoken willingly during consensual and usually casual encounters. Some of the gang members would tell Officer Gaxiola who the Rolling 60's rival gangs were, what feuds were ongoing, what other gangs were driving through the neighborhood or causing problems, and other information of that nature. Officer Gaxiola also spoke regularly to other police officers and read their reports to keep apprised of occurrences within his assigned gang area. Officers shared information on gangs and gang problems throughout the 77th Division usually on a daily basis.

Officer Gaxiola testified that in the mid-1970's the Neighborhood Crip gang split into several sets, with the Rolling 60's the largest and most powerful of the sets. Currently the Rolling 60's has about 1,200 documented members. By the 1980's, the Rolling 60's had earned the nickname "Rich Rolling" by committing takeover bank robberies; however, they continued to be "really big" committing robberies in general, as well as narcotics, drive-by shootings, and homicides. Officer Gaxiola had investigated homicides, drive-by shootings, robberies, burglaries, possession of firearms, as well as "a lot of" felony vandalism, narcotics sales, and incidents involving police evasion committed by Rolling 60's members.

Officer Gaxiola described the Rolling 60's colors, signs, and symbols, as well as the boundaries of the Rolling 60's territory and the territory of its rivals. Rolling 60's members preferred wearing blue and other attire signifying the gang, such as the baseball cap worn by Hysaw when he ran from the police after the shooting.[4] Officer Gaxiola had observed gang graffiti in the Rolling 60's neighborhood, and explained the gang's purpose in writing graffiti was to claim territory through fear and intimidation by reminding residents and rival gang members who they were. The more territory the gang

---

[4]     The cap featured an "O" for Orlando, and members of the Rolling 60's gang called themselves "O's."

controlled, the more powerful it was. Officer Gaxiola explained the several ways to join a gang, such as being "jumped in" by fighting several members of the gang, being born into gang family, and by proving one's loyalty by "putting in work" for the gang. He explained that putting in work meant committing such crimes as robbery, writing graffiti in rival gang territory, or a drive-by shooting.

In Officer Gaxiola's opinion, members of the Rolling 60's had engaged in a pattern of criminal activity, and the primary activities of the Rolling 60's were robberies, burglaries, murders, attempted murders, drive-by shootings, sales of narcotics, carrying weapons, firearms, evading the police, and felony vandalism. As predicate offenses demonstrating the gang's pattern of criminal activity, Officer Gaxiola presented three certified minute orders showing convictions of three Rolling 60's gang members. The first was Antonio Martice King, who was convicted of an attempted murder which was committed on or about March 19, 2008. Officer Gaxiola was involved in the investigation of that crime and testified as a gang expert in that case. He had known King for years as an admitted Rolling 60's gang member with the moniker of Baby Ahmin.[5] King was a member of the Rolling 60's at the time he committed the attempted murder of a rival gang member with a firearm.

Officer Gaxiola next presented the conviction of Jacob Cray, for carrying a concealed firearm on or about December 30, 2010, during a gang function attended by approximately 10 gang members. Officer Gaxiola was the arresting officer and testified against Cray at trial. He knew Cray from speaking to him during the officer's assignment in that area, and from prior arrests. Officer Gaxiola knew him to be a member of the Rolling 60's with the moniker Jay Hood.

The third certified minute order showed that Dante Lamar Ellis was convicted of a murder committed on or about April 12, 2012. Officer Gaxiola was involved in the

---

[5] Officer Gaxiola explained that the gang would give a member his moniker, also called a "hood name," once he had qualified or proven himself in the gang. Its usual purpose was to make identification by the police more difficult.

investigation, testified at trial as a gang expert, and knew Ellis from prior arrests and contacts. Ellis was a member of the Rolling 60's gang with the moniker Crip Star. Although the murder was a drive-by shooting in Van Ness Gangster gang territory, the victim was not a gang member, but had been mistaken for one while walking in front of a Van Ness Gangster hangout.

Officer Gaxiola had known of Meighan for three years. While assigned to the Rolling 60's gang, Officer Gaxiola had spoken to Meighan and members of his family on various occasions. Also, Officer Gaxiola had arrested Meighan before, and Meighan had admitted that he was a member of the Rolling 60's. Officer Gaxiola reviewed reports of other officers, including a report regarding Meighan's arrest in April 2009 when he was in the company of three other documented Rolling 60's gang members; a surveillance video showing Meighan with about 10 other members of the Rolling 60's at a known gang hangout in April 2010; and field interview cards prepared in June 2011 and February 2013, documenting Meighan's membership in the gang, with the moniker Stretch. Based upon his personal experience with Meighan and the reports of other officers, Officer Gaxiola opined that on March 2, 2013, Meighan was a member of the Rolling 60's.

Officer Gaxiola had known Hysaw since 2008, and had reviewed reports and field interview cards prepared by other officers regarding Hysaw. One report concerned a gang-related incident in November 2005, during which Hysaw was seen near Hyde Park and Crenshaw Boulevards, a known Rolling 60's hangout, with two other documented Rolling 60's members, one of whom said, "This is 60's hood, cuz." At a funeral gathering at Meighan's home on December 21, 2008, Officer Gaxiola spoke to Hysaw and prepared a field interview card noting that one of the two people in his immediate vicinity was a Rolling 60's gang member. Hysaw admitted to the officer that he was a member of the Rolling 60's, with the moniker Tee Tee. It was Officer Gaxiola's opinion that on March 2, 2013, Hysaw was also a member of the Rolling 60's. He based his opinion on other officers' reports, his own experience with Hysaw, Hysaw's association

with Meighan and other gang members, and the Orlando Magic cap that Hysaw wore the day of the shooting.

Given a hypothetical question mirroring the facts in evidence, Officer Gaxiola opined that the shooting and the evasion were committed in association with and for the benefit of a criminal street gang.

## DISCUSSION

### I. Substantial evidence

Meighan contends that the prosecution presented insufficient evidence to prove that the Rolling 60's was a criminal street gang. Hysaw joins in Meighan's contention and adopts Meighan's argument.

"'"'"We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction. [Citation.]"'"'" (*People v. Howard* (2010) 51 Cal.4th 15, 34.) Thus, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) We must presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We do not reweigh the evidence or resolve conflicts in the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "[B]ecause 'we *must* begin with the presumption that the evidence . . . *was* sufficient,' it is defendant, as the appellant, who 'bears the burden of convincing us otherwise.' [Citation.]" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1430.)

For purposes of the gang enhancement imposed pursuant to section 186.22, "'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of [specified] criminal acts enumerated in . . . subdivision (e), having a common name or common identifying sign or symbol, and whose members

8

individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) A "'pattern of criminal gang activity' means the commission [or] attempted commission of . . . two or more [enumerated] offenses, [the last of which occurred] within three years after a prior offense, and . . . were committed on separate occasions, or by two or more persons." (§ 186.22, subd. (e).) As relevant here, the enumerated acts include the commission or attempted commission of assault with a deadly weapon, murder, robbery, the sale of narcotics, discharging a firearm from a motor vehicle, felony vandalism, and possession of a concealed firearm. (186.22, subd. (e)(1)-(4), (6), (20), (22)-(23).)

The two required enumerated offenses, or "predicate offenses" need not be gang related, and may be proven with official court records establishing the convictions of two or more predicate offenses by members of the gang. (*People v. Gardeley* (1996) 14 Cal.4th 605, 610, 622-624 (*Gardeley*), disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13.) "[I]nstances of current criminal conduct can satisfy the statutory requirement for a 'pattern of criminal gang activity.'" (*People v. Loeun* (1997) 17 Cal.4th 1, 10-11.) In addition, "evidence of either past or present criminal acts listed in subdivision (e) of section 186.22 is admissible to establish the statutorily required primary activities of the alleged criminal street gang." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).)

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members. . . . [¶] Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Sengpadychith, supra*, 26 Cal.4th at pp. 323-324.) "Also sufficient might be expert testimony, as occurred in *Gardeley* . . . [where] a police gang expert testified that the [defendant's] gang . . . was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies[, basing] his opinion on conversations

9

he had with [the defendant] and fellow gang members, and on 'his personal investigations of hundreds of crimes committed by gang members,' together with information from colleagues in his own police department and other law enforcement agencies. (*Id*. at p. 324, quoting *Gardeley*, at p. 620.)

Meighan contends that Officer Gaxiola's testimony was insufficient because he merely concluded that the gang's primary activities were robberies, burglaries, murders, attempted murders, drive-by shootings, sales of narcotics and firearms, evading the police and felony vandalism, without providing a basis for this conclusion. We disagree, and to illustrate, we first address Meighan's suggestion that the three certified predicate convictions could not provide evidence of the gang's primary activities because the predicate offense requirement is a separate element from the required pattern of criminal gang activity.

To support his suggestion that the predicate crimes provided "no basis for [the officer's] conclusion," defendant relies on *People v. Vy* (2004) 122 Cal.App.4th 1209, 1222, and *In re Alexander L.* (2007) 149 Cal.App.4th 605, 611, but neither case supports his argument. Both cases recited the elements of the definition of "criminal street gang" as gleaned from *Gardeley, supra*, 14 Cal.4th at page 617, but did not hold or suggest that the predicate offenses admitted to show a pattern of criminal gang activity were inadmissible or irrelevant as proof of the gang's primary activities. Indeed, the *Vy* court explained that evidence of the commission and attempted commission of crimes enumerated in section 186.22, subdivision (e) "should satisfy both the 'primary activities' requirement under subdivision (f) and the 'pattern' requirement under subdivision (e)." (*Vy, supra*, at pp. 1227-1228.) Further, any comparison to the facts of *Alexander* fails, as the facts are very different from those in this case. Other than the hearsay statements about two crimes committed in a single year, the *entire* testimony of the officer regarding the gang's primary activities consisted of the following: "'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.'" (*Alexander, supra*, at pp. 611-613.)

10

There were no follow-up questions, no certified records of conviction, no testimony regarding extensive experience, personal contacts, or review, as in this case.

Here, by contrast, Officer Gaxiola presented certified court documents proving the convictions of the predicate crimes by Rolling 60's gang members. Such evidence was admissible and relevant in determining the gang's primary activities. (See *Sengpadychith, supra*, 26 Cal.4th at pp. 323-324.) The certified court records and Officer Gaxiola's testimony provided substantial evidence that Rolling 60's gang members personally known to him were convicted of three predicate crimes listed in section 186.22, subdivision (e): attempted murder, committed about five years prior to the current offense; carrying a concealed firearm, committed almost three years before the current offense; and murder, committed about one year prior to the current offense. In addition, the jury found Meighan, an admitted gang member, guilty of the current offenses of attempted murder and discharging a firearm from a vehicle. (See § 186.22, subd. (e)(3) & (e)(6).) Thus Officer Gaxiola did not merely conclude, without any basis for his opinion, that among the gang's primary activities were murder, attempted murder, drive-by shootings, and firearms offenses, rather his opinion was supported with relevant evidence in the form of certified court records of three such offenses committed or attempted by Rolling 60's gang members, and by the evidence in this case.

Defendant contends that there was nevertheless no evidence, other than the three predicate offenses and Officer Gaxiola's opinion, from which the jury could conclude that members of the Rolling 60's gang committed these crimes "consistently and repeatedly rather than only occasionally" as required to prove the gang's primary activities. (See *Sengpadychith, supra*, 26 Cal.4th at p. 323.) We disagree.

The predicate and current offenses were not the only evidence supporting Officer Gaxiola's opinion that the gang's primary activities were murder, attempted murder, drive-by shootings, and firearms offenses. Officer Gaxiola's opinion was amply and properly supported by his five years of experience while assigned to the Rolling 60's gang and its territory, his review of field interview cards, police reports, daily conversations about the gang's activities with his colleagues, conversations with

11

hundreds of gang members, and his personal investigations of such crimes committed by Rolling 60's gang members as homicides, drive-by shootings, robberies, burglaries, possession of firearms, as well as "a lot of" felony vandalism and narcotics sales -- all crimes listed in section 186.22, subdivision (e). (See *Sengpadychith, supra*, 26 Cal.4th at p. 324; *Gardeley, supra*, 14 Cal.4th at p. 620.)

Meighan contends that the reliability of the expert's opinion lacked an adequate foundation because Officer Gaxiola did not "quantify the number of gang investigations he had participated in or estimate the number of enumerated offenses committed by Rolling 60s gang members, or provide any details whatsoever of these contacts and investigations." "Of course, any material that forms the basis of an expert's opinion testimony must be reliable. [Citation.]" (*Gardeley, supra*, 14 Cal.4th at p. 618.) "So long as this threshold requirement of reliability is satisfied, even matter that is ordinarily *inadmissible* can form the proper basis for an expert's opinion testimony. [Citations.]" (*Ibid*.) Whether the foundational requirement of reliability has been shown is a matter for the trial court's discretion. (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1121-1122.) Thus, to preserve the issue for appeal, it must be raised in the trial court. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 948-949.) As there was no objection by the defense at trial that the foundation was inadequate or that the expert's opinion was based upon unreliable material, Meighan may not raise the issue for the first time on appeal.

In any event, contrary to Meighan's premise that precise details of the officer's contacts were required, it is the *sum* of the information drawn from many sources and on years of experience, which demonstrates reliability. (See *People v. Gonzalez, supra*, 38 Cal.4th at p. 949.) The reliability of a gang expert's opinion may be shown, as it was here, by his testimony regarding his education and training, years of experience in the gang's community, investigations, and corroborative information such as reports and communications with gang members and others. (*Id*. at pp. 945, 949 & fn. 4.) We conclude that Officer Gaxiola's testimony provided an adequate foundation for his opinion (cf. *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330), and that substantial evidence supported the gang enhancement.

## II. Consecutive sentences were proper

Hysaw contends that the trial court erred in imposing consecutive sentences as to count 1, accessory to a felony, and count 3, recklessly evading the police. He argues that the court was required by section 654 to stay one of the terms because both crimes were committed incident to a single intent and objective during an indivisible course of conduct.

Vehicle Code section 2800.2 is violated by any person who flees or attempts to elude a pursuing peace officer by driving a vehicle with a willful or wanton disregard for the safety of persons or property.

"Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony . . . , is an accessory to such felony." (§ 32.)

"An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) In general, section 654 precludes multiple punishments for a single physical act that violates different provisions of law, although "what is a single physical act might not always be easy to ascertain. In some situations, physical acts might be simultaneous yet separate for purposes of section 654." (*People v. Jones* (2012) 54 Cal.4th 350, 358.) In some cases, it may be appropriate to apply the "intent and objective" test. (*Id.* at pp. 359-360.) Under that test, "[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19 (*Neal*), disapproved on other grounds by *People v. Correa* (2012) 54 Cal.4th 331, 334, 336.)

"Because of the many differing circumstances wherein criminal conduct involving multiple violations may be deemed to arise out of an 'act or omission,' there can be no

13

universal construction which directs the proper application of section 654 in every instance. [Citation.]" (*People v. Beamon* (1973) 8 Cal.3d 625, 636.) Thus, whether a course of criminal conduct is divisible presents a factual issue for the trial court, and we will uphold its ruling if supported by substantial evidence. (*People v. Coleman* (1989) 48 Cal.3d 112, 162.) "Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence. [Citation.]" (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)[6]

Hysaw notes that the act which made him an accessory after the fact was assisting Meighan to escape from the scene of the shooting. After Officer Roberson gave chase, the evading offense began, during which Hysaw's objective was to avoid the arrest of both Meighan and himself. Hysaw argues that his assistance to Meighan and then his similar assistance to both Meighan and himself amounted to a single objective: to escape. He reasons that the crime of evasion was merely the *means* of perpetrating the crime of being an accessory to Meighan's crime, and that the two offenses were so closely connected in time that they constituted a single transaction.

The trial court found that Hysaw was an accessory to Meighan's crimes at the moment he assisted Meighan's flight from the scene of the shooting, and would have been independently prosecuted and liable for that crime if he had pulled over the moment the motorcycle officer activated his lights. A violation of section 32 is complete the moment the defendant knew that the felony was committed and did something to help the perpetrator get away with the crime. (See *People v. Nguyen* (1993) 21 Cal.App.4th 518, 536.) It can reasonably be inferred from the circumstances of the shooting that Hysaw

---

**6**     Neither Hysaw nor respondent has cited authority with comparable facts, and our research has revealed no cases which discuss Penal Code sections 654 and 32 in relation to Vehicle Code section 2800.2.

14

knew that his passenger had discharged a firearm from a motor vehicle in the direction of the two pedestrians, a felony. (See § 26100, subd. (c). Thus the moment Hysaw drove away from the scene of the shooting, he was an accessory to that crime.

As Meighan argues, the fact that one crime is technically complete before the other begins does not necessarily permit multiple punishment arising out of a continuing transaction. (*People v. Bauer* (1969) 1 Cal.3d 368, 377.) Under such circumstances, only one punishment would be permitted where the offenses were merely the means of accomplishing or facilitating a single objective. (*People v. Jaquette* (1967) 253 Cal.App.2d 38, 49; see *People v. Perez* (1979) 23 Cal.3d 545, 551-552.)[7] However, the trial court also found that once the high speed police pursuit began, Hysaw violated Vehicle Code section 2800.2, a separate crime with the separate intent to personally flee, although he also continued to violate Penal Code section 32 by assisting Meighan.

Substantial evidence supports the trial court's finding that Hysaw harbored two objectives: first, to help Meighan flee from the crime scene, and second, to effect his own escape. After Meighan fired at the two victims, Hysaw drove away at a normal rate of speed, and by the time patrol officers heard the radio call about three minutes later, he had left the scene of the shooting. Hysaw picked up speed on Figueroa Street likely because he heard the sirens of the two patrol cars in the area as they headed toward the scene of the shooting. The trial court could reasonably infer that Hysaw's second, separate objective to facilitate his own escape began at that moment, or at the moment he saw Officer Roberson's motorcycle behind him with lights and siren activated. The trial court could then reasonably conclude that Hysaw's reckless attempt to elude the pursuing officers was not *merely* the means to assist Meighan to escape.

We reject Hysaw's reasoning that the dual purpose of assisting himself and Meighan to escape was a single objective rather than two independent objectives held

---

**7**    For example, in *Neal*, the defendant, whose objective was to kill the victims by setting fire to their bedroom, could not be punished for both attempted murder and arson, as arson was the means of accomplishing the single objective. (*Neal, supra*, 55 Cal.2d at pp. 19-20.)

15

simultaneously.  Regardless, that dual objective ceased when Meighan got out of the car and Hysaw no longer had a reason to help him by further evasive driving.  Hysaw's continued reckless attempt to elude officers in violation of Vehicle Code section 2800.2, plus the fact that he ran from the officers after he collided with a fence, demonstrates that his sole remaining objective after Meighan left the car was to effect his own escape. Hysaw thus had both simultaneous and "similar but *consecutive* objectives" which permitted multiple punishment.  (*People v. Latimer* (1993) 5 Cal.4th 1203, 1212, citing e.g., *People v. Harrison* (1989) 48 Cal.3d 321, 334-338 [consecutive]; *People v. Coleman* (1989) 48 Cal.3d 112, 162 [simultaneous].)

## DISPOSITION

The judgments are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT